1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| SIMPLICITY INTERNATIONAL,<br><br>Plaintiff,<br><br>v.<br><br>GENLABS CORPORATION, and KRANSON<br>INDUSTRIES, INC., d/b/a<br>TRICORBRAUN,<br><br>Defendants. | CV 09-6146 SVW (RCx)<br><br>ORDER DENYING DEFENDANT<br>TRICORBRAUN'S MOTION TO COMPEL<br>ARBITRATION BUT GRANTING<br>TRICORBRAUN'S MOTION FOR A STAY<br>OF THIS ACTION PENDING<br>ARBITRATION [53]; DENYING AS<br>MOOT TRICORBRAUN'S MOTION FOR A<br>TRIAL CONTINUANCE [54]; AND<br>DENYING TRICORBRAUN'S MOTION<br>FOR SANCTIONS [55] |

18

19

20  **I.   INTRODUCTION**

21      This is a breach of contract and breach of warranty case brought

22  in this Court under diversity jurisdiction.  Plaintiff Simplicity

23  International ("Plaintiff" or "Simplicity") is a research and

24  development company that has developed a line of liquid cleaning

25  products.  In 2008 and 2009, Plaintiff had a sale agreement with

26  Walmart to sell certain of Plaintiff's liquid cleaning products to

27  retail consumers at Walmart stores ("the Walmart Project").  Plaintiff

28  entered into separate contracts with each of the named Defendants in

Exhibit 1

1 | this action, Genlabs Corp. ("Genlabs") and Kranson Industries, Inc.
2 | d/b/a Tricorbraun ("Tricorbraun") to assist in the production and
3 | shipment of Simplicity's liquid cleaning products for the Walmart
4 | Project.  Genlabs was hired to mix the formulas for Plaintiff's
5 | cleaning products and package the products in bottles for delivery to
6 | Walmart stores.  Tricorbraun was hired to make the bottles and labels
7 | that were used by Genlabs to package the products.

8 | Ultimately, when the products arrived at Walmart stores, a
9 | substantial amount of the bottles had defective labeling and were unfit
10 | for retail sale.  As a result, Plaintiff alleges that it lost the
11 | relationship with Walmart.  The primary issues in this case are whether
12 | fault lies with Genlabs or Tricorbraun (or both or neither) for the
13 | defective labeling,[1] and the scope of Plaintiff's alleged damages.

14 | On April 5, 2010, Defendant Tricorbraun filed three motions, each
15 | of which came before the Court for a hearing on May 3, 2010.  First,
16 | Tricorbraun moved for an order compelling the dispute between Plaintiff
17 | and Tricorbraun to arbitration pursuant to an arbitration agreement
18 | entered into between the parties, and for a motion to stay this action
19 | pending a resolution of the arbitration.  Plaintiff opposed the motion
20 | to compel.  Defendant Genlabs did not oppose the motion to compel, on
21 | the condition that any order compelling arbitration between Plaintiff
22 | and Tricorbraun would not delay the suit between Plaintiff and Genlabs.

23 |
24 |

25 | [1] Plaintiff initially sued only Defendant Genlabs in this action.  Defendant
26 | Genlabs thereafter brought a third-party complaint against Tricorbraun for
implied indemnity.  However, on February 16, 2010 Genlabs stipulated to
27 | dismiss its third-party complaint against Tricorbraun without prejudice.  The
next day, Plaintiff sought leave to amend its Complaint to add Tricorbraun as
a direct Defendant, which the Court granted.  Plaintiff filed its First
28 | Amended Complaint naming both Genlabs and Tricorbraun on March 22, 2010.

1    In the alternative, Tricorbraun brought a motion for a six-month
2  trial continuance in the event that its motion to compel arbitration is
3  denied.  Finally, Tricorbraun filed a motion for sanctions against
4  Plaintiff's counsel, Alfred Dovbish, for having an ex parte
5  communication with an employee of Tricorbraun.

6    For the reasons stated below, the Court finds that a valid
7  arbitration agreement exists between Plaintiff and Tricorbraun and that
8  the dispute at issue is arbitrable under that agreement.  However, this
9  Court sitting in the Central District of California cannot compel
10 arbitration in the forum agreed to by the parties, St. Louis, Missouri.
11 Thus, the Court DENIES Tricorbraun's motion to compel arbitration, but
12 GRANTS Tricorbraun's motion to stay this action.[2]  The action against
13 Tricorbraun is stayed pending arbitration of the dispute in accordance
14 with the contract between Plaintiff and Tricorbraun.  Tricorbraun is
15 advised that a motion to compel arbitration must be filed in the
16 district where the arbitration is to be held.

17   Tricorbraun's motion for a trial continuance is therefore DENIED
18 as MOOT.

19   Tricorbraun's Motion for Sanctions is DENIED.

20 **II.  MOTION TO COMPEL ARBITRATION AND FOR A STAY**

21   **A.   Background**

22   As stated above, Simplicity is a research and development company
23 headquartered in Longmont, Colorado that created a liquid laundry
24 detergent and fabric softener which it sold to Walmart stores from

25 _____
   [2] At the May 3, 2010 hearing, the Court granted the motion to compel, and indicated
26 that the Court was ordering the matter to arbitration.  That ruling was in error.
   Neither party had raised the issue (either in briefing or at the hearing) of
27 whether this Court could order arbitration in a district outside of the Central
   District of California.  Upon review of the relevant authority, however, the Court
   concludes that it cannot do so.  For this reason, the Court grants Tricorbraun's
28 motion for a stay of this action pending arbitration.

3

1 January 2008 to August 2009 ("the Walmart Project").  Tricorbraun is a

2 company specializing in the design and supply of rigid packaging

3 solutions.  Tricorbraun is headquartered in St. Louis, Missouri.

4     In or about October 2007, the owner of Simplicity, Jeff Wycoff,

5 contacted Tricorbraun and asked Tricorbraun to assist Plaintiff in

6 designing and supplying the bottles needed for its line of liquid

7 detergent and fabric softener to be used for the Wal-Mart Project.

8 Tricorbraun agreed to do so.  To consummate the relationship, Wycoff

9 (on behalf of Plaintiff) signed an agreement titled "Credit Application

10 and Terms and Conditions of Sale," on November 14, 2007 ("the

11 Agreement").  (Dunwiddie Decl., Exh. A.)  The Agreement consists of two

12 pages: the first page is a form in which Wycoff provided very general

13 information about Simplicity including its business address, the names

14 and contact information of the owners, the state of incorporation, and

15 the tax identification number.  The second page is titled "Terms and

16 Conditions of Sale."  The very first lines of the Terms and Conditions

17 of Sale read:

18        EXCLUSIVE GOVERNING PROVISIONS: The sale of all goods and
services by the seller (the "Company") to the purchaser shall
19        be subject to and governed exclusively by these terms and
conditions of sale (the "Conditions").  The Company's
20        acceptance of any order or other offer by the purchaser . . .
for any goods or services shall be conditioned on the
21        purchaser's assent to these Conditions.  Such assent shall be
deemed given five days after the earlier to occur of (i) the
22        Company's deposit of these conditions in the U.S. Mail,
postage prepaid, addressed to the purchaser, or (ii) the
23        purchaser's receipt of these Conditions; unless, prior to the
expiration of such period [the purchaser objects in writing
24        to the Conditions].

25 Id. The document then goes on to state conditions relevant to payment

26 terms, taxes, delivery terms, risk of loss, disclaimers of warranties,

27 product testing, jurisdictional provisions, and the like.

28

Case: 4:10-cv-01070-TCM   Doc. #: 1-1   Filed: 06/15/10   Page: 5 of 26 PageID #: 11

Case 2:09-cv-06146-SVW-RC   Document 113   Filed 05/06/10   Page 5 of 26

Relevant to the current motion to compel, the Terms and Conditions of Sale includes the following arbitration clause:

> 13.  ARBITRATION: ANY DISPUTE, CONTROVERSY, OR CLAIM ARISING FROM THE SALE OF GOODS OR SERVICES BY COMPANY TO PURCHASER SHALL BE RESOLVED BY FINAL AND BINDING ARBITRATION ADMINISTERED BY THE AMERICAN ARBITRATION PROVISION ("AAA") UNDER ITS COMMERCIAL ARBITRATION RULES.  ALL SUCH ARBITRATION PROCEEDINGS SHALL TAKE PLACE IN ST. LOUIS, MISSOURI.

Id.  The Agreement also includes the following choice-of-law provision:

> 17.  APPLICABLE LAW.  The terms of these Conditions shall be interpreted and the rights and obligations of the parties hereto shall be governed and determined by the Uniform Commercial Code and the other internal laws of the State of Missouri.  Whenever the term "Uniform Commercial Code" is used herein, it shall be construed as meaning the Uniform Commercial Code as adopted by the State of Missouri as effective and in force on the date of this sale. . . .

Id.  Finally, the Agreement includes the following language in all capital letters just above the signature line where Wycoff signed:

> THE UNDERSIGNED APPLICANT AGREES THAT THE SALE OF ALL GOODS AND SERVICES BY THE SELLER, INCLUDING THOSE FOR WHICH CREDIT IS EXTENDED PURSUANT TO THIS CREDIT APPLICATION AND TERMS AND CONDITIONS OF SALE, SHALL BE SUBJECT TO THE TERMS AND CONDITIONS OF SALE AS SET FORTH ABOVE . . .

Id.

Wycoff does not dispute that on November 14, 2007, he signed the Agreement at the bottom of the page containing the Terms and Conditions of Sale.  Further, it is undisputed that after this Agreement was signed, Tricorbraun provided goods and services to Simplicity and Simplicity paid for such goods and services.

Tricorbraun argues that the Agreement and the arbitration clause therein is valid, irrevocable and enforceable; thus, the Court must compel this action to arbitration.  In response, Plaintiff contends that the Agreement did not constitute a valid contract.  Plaintiff argues that the Agreement was simply an application for credit, which was contingent upon Tricorbraun extending credit to Plaintiff.

1 │ Plaintiff asserts that Tricorbraun denied the credit application;[3] thus,

2 │ the "purported contract" never existed or was never validly formed.

3 │     **B.**   **Legal Standard**

4 │     The parties dispute the legal standard that governs Tricorbraun's

5 │ motion to compel arbitration. Tricorbraun argues that the Federal

6 │ Arbitration Act ("FAA") governs the issue of arbitrability, whereas

7 │ Plaintiff asserts that California law should control. The primary

8 │ difference between the two is that under California law, even if a

9 │ binding and valid arbitration agreement exists, the California Code of

10 │ Civil Procedure § 1281.2 provides the Court with discretion not to

11 │ enforce the arbitration agreement where one party to the agreement is

12 │ "also a party to a pending court action . . . with a third party

13 │ arising out of the same transaction or series of related transactions

14 │ and there is a possibility of conflicting rulings . . ." Cal. Code

15 │ Civ. Proc. 1281.2.[4] Under the FAA, in contrast, the Court **must** compel

16 │ arbitration "upon being satisfied that the making of the agreement for

17 │ arbitration and the failure [of one party] to comply therewith is not

18 │ in issue." 9 U.S.C. § 4; <u>Chiron Corp. v. Ortho Diagnostic Sys. Inc.</u>,

19 │ 207 F.3d 1126, 1130 (9th Cir. 2000) (By its terms, the FAA "leaves no

20 │ place for the exercise of discretion by a district court, but instead

21 │ mandates that district courts *shall* direct the parties to proceed to

22 │ arbitration on issues as to which an arbitration agreement has been

23 │ signed.") (emphasis in original). (quoting <u>Dean Witter Reynolds, Inc.</u>

24 │ 

25 │ [3] Tricorbraun disputes this fact. Tricorbraun contends that it never denied Plaintiff's credit application and that, in fact, Tricorbraun provided certain goods to Plaintiff on credit. As explained below, however, this factual dispute is not material.

26 │ [4] In such circumstances, the Court may order "intervention or joinder of all parties in a single action or proceeding." Cal. Code Civ. Proc. 1281.2. Here, Plaintiff

27 │ has asserted identical claims arising out of the same transaction or series of transactions against Defendant Genlabs, which is not subject to any arbitration

28 │ agreement.

1 | v. Byrd, 470 U.S. 213, 218 (1985)).

2 | Contrary to Plaintiff's argument otherwise, the FAA clearly
3 | governs the arbitrability of the present dispute.  The FAA applies to
4 | any "contract evidencing a transaction involving commerce."  9 U.S.C. §
5 | 2.  "Commerce" is defined as "commerce among the several states or with
6 | foreign nations," and is interpreted broadly.  9 U.S.C. § 1; Lucas v.
7 | Gund, Inc., 450 F. Supp. 2d 1125, 1129 (C.D. Cal. 2006); Circuit City
8 | Stores, Inc. v. Adams, 532 U.S. 105, 112 (2001) ("involving commerce"
9 | interpreted as "implementing Congress's intent 'to exercise its
10 | commerce power to the full.'")  Where the agreement involves commerce,
11 | "the FAA creates a 'body of federal substantive law of arbitrability'
12 | enforceable in both state and federal courts and preempting any state
13 | laws or policies to the contrary."  In re Jamster Marketing Litig., MDL
14 | No. 1751, No. 05cv0819 JM (CAB), 2008 WL 4858506, at *2 (S.D. Cal.,
15 | Nov. 10, 2008) (quoting Moses H. Cone  Memorial Hosp. v. Mercury Const.
16 | Corp., 460 U.S. 1, 24 (1983)); Cohen v. Wedbush, Noble, Cooke, Inc.,
17 | 841 F.2d 282, 285 (9th Cir. 1988).

18 | Here, the parties do not dispute that their contract involved
19 | commerce.  Indeed, the goods provided for under the agreement between
20 | Plaintiff and Tricorbraun were shipped across state lines several
21 | times: the molds used to create the bottles were manufactured in
22 | California and then shipped across state lines to Atlanta, Georgia; the
23 | bottles were manufactured from such molds in Atlanta and then shipped
24 | across state lines to Genlabs' facility in Mississippi for filling and
25 | labeling; and finally, once the bottles were filled with the product
26 | and labeled, they were shipped to Walmart stores across the country.
27 |
28 |

1  Thus, the FAA clearly applies to this contract.[5]

2      Under the FAA, if a valid arbitration agreement exists, it must be

3  enforced by the federal courts.  9 U.S.C. § 1, *et. seq.*.  Thus, the

4  court's role under the FAA is limited to determining: (1) whether a

5  valid arbitration agreement exists, and if it does, (2) whether the

6  agreement encompasses the dispute at issue.  Chiron Corp. v. Ortho

7  Diagnostic Systems, Inc., 207 F.3d 1126, 1130 (9th Cir. 2000).  If

8  these inquiries are met, the district court shall stay further

9  proceedings and order arbitration.  9 U.S.C. §§ 3, 4.  Finally, the FAA

10 evidences a broad policy in favor of arbitration; "as a matter of

11 federal law, any doubts concerning the scope of arbitrable issues

12

13 [5] Notably, parties may contract around the provisions of the FAA through a valid
    choice-of-law provision, but only where such choice-of-law provision *expressly*
    incorporates the *procedural* rules of a specific jurisdiction.  Stone & Webster,
14  Inc. v. Baker Process, Inc., 210 F. Supp. 1177 (S.D. Cal. 2002).  Absent such a
    specific provision, the Supreme Court has held that the federal rules under the FAA
15  govern whether an arbitration will be ordered, and the allocation of authority
    between the courts and arbitrators.  Mastrobuono v. Shearson Lehman Hutton, Inc.,
16  514 U.S. 52, 62 (1995); see Chiron Corp., 207 F.3d at 1130 (a general choice-of-law
    clause does not incorporate state rules that govern the allocation of power between
    courts and arbitrators); Wolsey, Ltd. v. Foodmaker, Inc., 144 F.3d 1205, 1212-13
17  (9th Cir. 1998) (same).  As the court explained in Stone & Webster, Inc.:

18          [I]n order to contract around the FAA, parties must *expressly* do so in
            their agreement. . . . [I]f parties intend state laws to govern the
19          issue of arbitrability (where the issue would otherwise be governed by
            the FAA), they must make specific reference to the state law they
20          intend to incorporate in their contract. . . . A general choice-of-law
            clause will not suffice.  A general choice-of-law clause will only be
21          construed as incorporating state substantive laws, NOT state procedural
            laws.

22  210 F. Supp. 2d at 1182 (emphasis in original) (internal citations omitted).
         Here, the parties did not contract around the FAA.  Certainly, there is no
    evidence that the parties contracted for California law to apply to their
23  relationship.  Thus, Plaintiff's argument regarding the California Code of Civil
    Procedure is wholly unfounded.  Further, while the parties' Agreement did include a
24  choice-of-law provision indicating that Missouri law would apply to their
    substantive rights and obligations, the provision was a general choice-of-law
25  clause and did not specifically incorporate Missouri procedural rules related to
    arbitration.  Cf., Fiordelisi v. Mt. Pleasant LLC, 254 S.W.3d 120 (E.D. Mo. 2008)
26  (agreement explicitly incorporated Missouri procedural rules where the arbitration
    clause stated: "The parties shall proceed with arbitration in accordance with the
    rules and procedures of the American Arbitration Association *and the provisions of*
27  *the Missouri Uniform Arbitration Act.*") (emphasis added).  Thus, the FAA applies to
    the Agreement between the parties.

28

1  should be resolved in favor of arbitration. . . ."  Mastrobuono v.
2  Shearson Lehman Hutton, Inc., 514 U.S. 52, 62 n.8 (1995) (quoting Moses
3  H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25
4  (1983)).

5    **C.   Existence and Validity of the Agreement**
6        **1.   Allocation of Authority Between the Court and the**
7             **Arbitrator**

8        Under the FAA, a party may challenge the validity or
9  enforceability of an arbitration agreement "upon such grounds that
10 exist at law or in equity for the revocation of any contract."  9
11 U.S.C. § 2.  Challenges to the validity of an arbitration agreement can
12 take several forms and the nature of the challenge governs whether the
13 Court or the arbitrator must resolve the issue.  See Buckeye Cashing
14 Inc. v. Cardegna, 546 U.S. 440, 444 (2006).  Where a party specfically
15 challenges the validity of *the agreement to arbitrate* - for example, on
16 the ground that the arbitration clause is unconscionable - the district
17 court, and not the arbitrator, must resolve the issue.  Id. at 445.
18 Conversely, where a party challenges the validity of the contract as a
19 whole - i.e., the underlying contract that contains the arbitration
20 provision - the allocation of authority between the court and the
21 arbitrator turns on whether the party is challenging the very **existence**
22 of the contract or its **enforceability**.

23      Challenges to the existence or formation of the underlying
24 contract are resolved by the district court.  Sanford v. Memberworks,
25 Inc., 483 F.3d 956, 962 (9th Cir. 2007).  For example, in Sanford,
26 the plaintiff ordered a set of fitness tapes in response to a
27 television advertisement, and upon doing so, was automatically enrolled
28

1   in program entitling her to discounts on certain retail products in

2   exchange for a monthly fee.  Id.  958-59.  Defendant sent plaintiff a

3   "membership kit" regarding the discount program, including a contract

4   that contained an arbitration clause.  Id. at 959.  Plaintiff disputed

5   ever receiving the membership kit or assenting to the membership

6   contract.  Id.  The court held that the existence of the membership

7   contract was a matter for the court to decide, not the arbitrator:

8           It is axiomatic that arbitration is a matter of contract and
            a party cannot be required to submit any dispute which he has
9           not agreed so to submit.  As a result, when one party
            disputes the making of the arbitration agreement, the Federal
10          Arbitration Act requires that "the court [] proceed summarily
            to the trial thereof" before compelling arbitration under the
11          agreement.  9 U.S.C. § 4. We have interpreted this language
            to encompass not only challenges to the arbitration clause
12          itself, but also challenges to the making of the contract
            containing the arbitration clause. . . . [C]hallenges to the
13          *existence* of a contract as a whole must be determined by the
            court prior to ordering arbitration.
14
    Id. at 962 (emphasis in original).
15
16      Conversely, challenges to the enforceability of the contract as a

17  whole - for example, where the contract is illegal or unconscionable -

18  are considered by the arbitrator.  Buckeye Check Cashing, Inc., 546

19  U.S. at 446.  As the Supreme Court in Buckeye explained, "as a matter

20  of substantive federal arbitration law, an arbitration provision is

21  severable from the remainder of the contract . . .; [thus,] unless the

22  challenge is to the arbitration clause itself, the issue of the

23  contract's validity is considered by the arbitrator in the first

24  instance."  Id.

25      Here, it is clear that Plaintiff is not challenging the

26  arbitration provision specifically.  Rather, Plaintiff contends that

27  the underlying contract that contains the arbitration agreement - the

28  "Credit Agreement and Terms and Conditions of Sale" ("the Agreement") -

1  never constituted a valid contract. Specifically, Plaintiff argues

2  that the Agreement was a credit application and that the terms and

3  conditions therein were contingent upon Tricorbraun's acceptance of the

4  application. Thus, Plaintiff contends that when Tricorbraun

5  purportedly denied Plaintiff's credit application, the agreement was

6  "void ab initio." (Opp'n at 4.) This is clearly a challenge to the

7  existence of the underlying contract. Thus, the Court, not the

8  arbitrator, must resolve whether the Agreement constituted a valid

9  contract.[6]

10     ## 2.   Right to a Jury Trial?

11     The next issue the Court must address is whether it must submit

12  the issue of contract formation to a jury. The FAA provides that,

13  where the making of the arbitration agreement is in issue, "the court

14  shall proceed summarily to the trial thereof." 9 U.S.C. § 4.

15  Additionally, the statute provides that "where such an issue is raised,

16  the party alleged to be in default [of the arbitration agreement] may

17  . . . on or before the day of the return day of the notice of

18  application, demand a jury trial of such issue, and upon such demand

19  the court shall make an order referring the issue or issues to a jury

20  . . . ." Id.

21     Courts have interpreted this language to require a jury trial

22  "only where there is a triable issue concerning the existence or scope

23  of the agreement." Hill v. Ins. Co. of West, No. 10cv76 BTM (BLM),

24  _____

[6] To the extent that the Plaintiff is arguing instead that a valid contract was
25  formed, but Plaintiff's performance became excused by the denial of credit – i.e.,
that the acceptance of credit was a basic assumption upon which the contract was
26  made and the non-occurrence of that event excused Plaintiff's performance – the
issue is one of *enforceability* of the contract, which would be decided by the
27  arbitrator. See Buckeye Check Cashing, Inc., 546 U.S. at 446; Restatement (Second)
Contracts § 261 (discharge of performance by impracticability). This does not
appear to be Plaintiff's argument; however, even if it were, arbitration would be
28  the proper forum to resolve that issue.

2010 WL 1709325, at *3 (S.D. Cal., Apr. 26, 2010) (quoting <u>Saturday</u>
<u>Evening Post Co. v. Rumbleseat Press</u>, 816 F.2d 1191, 1196 (7th Cir.
1987)).[7]  A jury trial is not warranted if the arbitrability of the
parties' dispute involves no questions of material fact.  <u>Saturday</u>
<u>Evening Post Co.</u>, 816 F.3d at 1196 ("If the arbitrability of the
parties' dispute involves no questions or only legal questions, a jury
trial would be pointless because its outcome could not affect the
judge's decision on whether to order arbitration."); <u>see Par-Knit</u>
<u>Mills, Inc. v. Stockbridge Fabrics Co.</u>, 636 F.2d 51, 54-55 (3d Cir.
1980) (same).  The party resisting arbitration bears the burden of
showing that he is entitled to a jury trial under section 4.  <u>Dillard</u>
<u>v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 961 F.2d 1148, 1154
(5th Cir. 1992); <u>Doctor's Associates Inc. v. Distajo</u>, 107 F.3d 126,
129-30 (2d Cir. 1997).  Thus, "as when opposing a motion for summary
judgment under Fed. R. Civ. P. 56, the party requesting a jury trial
must 'submit evidentiary facts showing that there is a dispute of fact
to be tried.'"  <u>Doctor's Assoc. Inc.</u>, 107 F.3d at 129-30 (quoting
<u>Oppenheimer & Co., Inc. v. Neidhardt</u>, 56 F.3d 352, 358 (2d Cir. 1995)).

Here, Plaintiff clearly has not met its burden of establishing
that a jury trial is required regarding the existence of the Agreement.
First, Plaintiff has not demanded a jury trial with respect to the
issue of whether an arbitration agreement exists.[8]  Second, even if
Plaintiff had made such a demand, as explained more fully below, there
are no material disputes of fact as to the existence of the contract

---

[7] The Ninth Circuit recently adopted this same view in an unpublished opinion. <u>Reily</u>
<u>v. WM Financial Servs. Inc.</u>, 95 Fed. Appx. 851, 852 (9th Cir. 2004).

[8] Plaintiff generally demanded a jury trial in the caption of its First Amended
Complaint; however, Plaintiff did not raise this issue in connection with
Tricorbraun's motion to compel nor did it argue for a jury trial on the issue of
whether a valid arbitration agreement exists between the parties.

1  that contained the arbitration agreement between Plaintiff and
2  Tricorbraun.  Thus, the Court may decide, based on the **undisputed**
3  evidence submitted in connection with this motion, whether a valid
4  contract exists between Plaintiff and Tricorbraun.

5          **3.   Whether a Valid Contract Was Formed**

6      The Court now turns to the merits of Tricorbraun's motion.  As
7  stated above, the parties dispute whether the Agreement constituted a
8  valid contract.  Plaintiff asserts that the Agreement was nothing more
9  than a credit application - i.e., an application to purchase goods from
10  Tricorbraun on credit.  According to Plaintiff, Tricorbraun
11  subsequently denied the application for credit, which required
12  Plaintiff to obtain a Letter of Credit from a third party to purchase
13  the goods.  Plaintiff contends that the Agreement was contingent upon
14  Tricorbraun's acceptance of credit, which never occurred.  Thus, the
15  Agreement never came into existence.  In response, Tricorbraun first
16  asserts that it never denied credit to Plaintiff.  More importantly,
17  however, Tricorbraun argues that the Agreement was not contingent upon
18  any extension of credit to Simplicity.

19      Under the FAA, the court must apply general state contract law
20  principles to determine whether an agreement to arbitrate was formed
21  and is valid.   Ingle v. Circuit City Stores, Inc., 328 F.3d 1165, 1170
22  (9th Cir. 2003) ("To evaluate the validity of an arbitration agreement,
23  federal courts 'should apply ordinary state-law principles that govern
24  the formation of contracts.'") (quoting First Options of Chicago, Inc.
25  v. Kaplan, 514 U.S. 938, 944 (1995)).  The first inquiry is which

26
27
28

1   state's law shall apply to the contract dispute.[9]  "A federal court

2   sitting in diversity must apply the choice-of-law rules of the state in

3   which it sits."  _IMA North America, Inc. v. Marlyn Nutraceuticals,_

4   _Inc._, No. CV-06-0344-PHX-LOA, 2008 WL 312090, at *4 (D. Ariz. Feb. 1,

5   2008) (citing _Fields v. Legacy Heath Sys._, 413 F.3d 943, 950 (9th Cir.

6   2005)).  Thus, this Court applies California choice-of-law rules to

7   determine which jurisdiction's law applies.

8        In contract cases, California courts follow the principles of the

9   Restatement Second of Conflict of Laws ("the Restatement") and the

10  California Commercial Code regarding choice-of-law issues.  _Shannon-_

11  _Vail Five, Inc. v. Bunch_, 270 F.3d 1207, 1210-11 (9th Cir. 2001);

12  WITKIN, 1 SUMMARY OF CALIFORNIA LAW, CONTRACTS §§ 66-67, (10th ed. 2005).

13  Section 187 of the Restatement generally provides that if the parties

14  have chosen a particular state's law to govern their dealings, the

15  court will honor that choice.[10]  Rest. (Second) Conflicts of Laws § 187;

16  _Shannon-Vail Five, Inc._, 270 F.3d at 1211; _Ribbens Int'l, S.A. de C.V._

17  _v. Transport Int'l Pool, Inc._, 47 F. Supp. 2d 1117, 1120-21 (C.D. Cal.

18  1999); WITKIN, 1 SUMMARY OF CALIFORNIA LAW, CONTRACTS § 66.  Here, the parties

19  have agreed that the "rights and obligations of the parties" with

20  regard to the sale of goods from Tricorbraun to Simplicity shall be

21

22  [9] The Court notes that neither party addressed the choice-of-law issue in their
    briefs.  Additionally, when addressing the issue of whether a valid contract was
23  formed, **neither party cited any applicable authority from any jurisdiction** in
    support of their arguments.  Thus, the parties have not argued that any particular
    jurisdiction's laws should apply to this case.

24  [10] There are exceptions to this rule where the chosen state has no substantial
    relationship to the parties or the transaction or application of the law of the
25  chosen state would be contrary to a fundamental policy of a state which has a
    materially greater interest in the determination of the issue.  Rest. (Second)
26  Conflict of Laws § 187(2).  However, the Court has no reason to believe either of
    these exceptions apply.  Here, the chosen state - Missouri - clearly has a
27  relationship to the parties and the transaction because Tricorbraun is
    headquartered in St. Louis, Missouri.  Further, the parties have not identified any
    other state that would have a materially greater interest in the resolution of this
28  dispute.

1 governed by the "internal law of the State of Missouri," and the
2 Uniform Commercial Code as adopted by the State of Missouri.
3 (Dunwiddie Decl., Exh. A).  Thus, the Court will apply Missouri law to
4 determine whether a valid contract was formed.[11]

5      A valid contract for the sale of goods must include three basic
6 elements: an offer, acceptance, and consideration.  Walker v. Rogers,
7 182 S.W.3d 761, 767 (W.D. Mo. 2006) (citing Luebbert v. Simmons, 98
8 S.W. 3d 72, 77 (Mo. App. W.D. 2003)).  In deciding whether these
9 elements are met, the court must look to the Missouri Uniform
10 Commercial Code, as well various principles of the common law of
11 contracts that have not been displaced by the Code.  Mo. Ann. Stat. §
12 400.1-103.

13      Under the Missouri Uniform Commercial Code, "a contract for the
14 sale of goods may be made in any manner sufficient to show agreement,
15 including conduct by both parties which recognizes the existence of
16 such a contract."  Mo. Ann. Stat. § 400.2-204(1).  The Code focuses
17 primarily upon "mutuality of assent as [objectively] manifested by the
18 conduct of the parties."  Computer Network, Ltd. v. Purcell Tire &
19 Rubber Company, 747 S.W. 2d 669, 673-74 (E.D. Mo. 1988).  "The intent
20 with which we are concerned is the *objective* manifestation of intent by
21 the parties, that is, what a reasonably prudent person would be led to
22 believe from the actions and words of the parties."  Id. at 675
23 (quoting Immel, 1 Missouri Bar CLE, Civil Actions, § 7.1 (1980) and

24
[11] Missouri law regarding the formation of contracts is not materially different from
25 California law.  Both States have adopted the provisions of the Uniform Commercial
Code relating to the formation of contracts for the sale of goods.  See Mo. Ann.
26 Stat. § 400.2-204; Cal. Comm. Code § 2204.  As to the rules of contract formation
more generally, the laws do not vary significantly from jurisdiction to
27 jurisdiction; both Missouri and California follow the approach stated in the
Restatement Second of Contracts.  See Rest. (Second) Contracts §§ 18-70; Walker v.
Rogers, 182 S.W. 3d 761, 767-69(W.D. Mo. 2006); Fosson v. Palace (Waterland) Ltd.,
28 78 F.3d 1448, 1453 (9th Cir. 1996).

1  citing <u>Embry v. Hargadine, McKittrick Dry Goods Co.</u>, 127 Mo. App. 383

2  (1907)).  If the expressions in the agreement are clear, the court can

3  determine the intent of the parties from the writing alone; if not,

4  surrounding circumstances such as the subsequent actions of the parties

5  and the practical construction of the contract may be considered.  <u>Id.</u>

6  at 674.

7      Here, the Court concludes that both the expressions of the

8  Agreement itself and the parties' conduct objectively manifest the

9  intent to enter into a valid contract.  First, Tricorbraun's conduct

10  evidences a valid offer.  An offer is "the manifestation of a

11  willingness to enter into a bargain, so made as to justify another

12  person in understanding that his assent to that bargain is invited and

13  will conclude it."  <u>Walker</u>, 182 S.W. 3d at 767 (citing Rest. (Second)

14  Contracts, § 24 (1981)); <u>Nordyne, Inc. v. Int'l Controls & Measurements</u>

15  <u>Corp.</u>, 262 F.3d 843, (8th Cir. 2001) (noting that the UCC in Missouri

16  does not define "offer;" thus, Missouri looks to its common law and the

17  Restatement of Contracts for the definition).  Here, Tricorbraun and

18  Simplicity discussed and agreed in October 2007 that Tricorbraun would

19  assist Simplicity with the design and supply of bottles and labels for

20  its liquid cleaning products.  (Dunwiddle Decl. ¶ 3.)  Thereafter,

21  Tricorbraun sent Simplicity the "Credit Application and Terms and

22  Conditions of Sale" ("the Agreement") which outlined the terms and

23  conditions upon which it would be willing to sell goods to Simplicity,

24  including but not limited to, payment terms, delivery terms, assignment

25  rights, risk of loss, testing, and warranties.  The Agreement made it

26  clear that Simplicity would be required to assent to such terms before

27  Tricorbraun would provide goods to Simplicity.  (Dunwiddie Decl., Exh.

28

A, ¶ 1.)   Tricorbraun made a valid offer to contract upon those terms.

Furthermore, Simplicity clearly assented to the Agreement, including all the applicable Terms and Conditions.  The UCC in Missouri is very liberal with respect to how an offer may be accepted.   1 Missouri Practice Series, Method of Practice: Transaction Guide § 19.6 (4th ed. 2009).  Specifically, an offer may be accepted by any manner "reasonable under the circumstances" unless the language of the offer deems how it is to be accepted.  Mo. Ann. Stat. § 400.2-206(1)(a). Here, the Agreement specifically provides that Simplicity will be deemed to have assented to the Terms and Conditions upon receipt thereof, unless Simplicity rejects the Terms and Conditions in writing. (Dunwiddie Decl., Exh. A, ¶ 1.)  Simplicity received the Agreement and never objected to the Terms and Conditions.  (Wycoff Depo. at 256:8-14.)  Moreover, the founder of Simplicity, Jeff Wycoff, admits that he signed the Agreement on November 14, 2007.  (Id.)  This is sufficient to constitute acceptance of the terms.  Computer Network Ltd., 747 S.W. 2d at 676 (where offeror sent a letter detailing the terms of the agreement and asked appellant to either sign the agreement or object to the terms, appellant's signature constituted a binding contract). Finally, although the Court need not consider extrinsic evidence given the clarity of the Agreement itself, Wycoff testified unequivocally that he understood his signature on the Agreement to be an assent to the Terms and Conditions contained therein, and that those terms were applicable to his business relationship with Tricorbraun.  (Id. at 256:20-257:7.)  In light of this evidence, there can be no doubt that the parties intended the Agreement to be a valid and binding contract.[12]

---

[12] That the Agreement is supported by consideration is obvious; Tricorbraun promised to provide goods to Simplicity in exchange for Simplicity's agreement to pay.

1  Nonetheless, Plaintiff argues that the Agreement is invalid
2  because Tricorbraun purportedly denied credit to Simplicity, and such
3  denial rendered the Agreement and its terms "void ab initio."  Of
4  course, this argument depends upon the assumption that the Agreement
5  was contingent upon Tricorbraun's extension of credit to Simplicity.
6  But there is no evidence to support this interpretation.  The language
7  of the Agreement itself does not, in any way, make the validity of the
8  terms and conditions contingent upon an extension of credit.  To the
9  contrary, the Agreement expressly states that "the sale of **all** goods
10 and services by the seller, including those for which credit is
11 extended . . . shall be subject to the terms and conditions of sale as
12 set forth above."  (Dunwiddie Decl., Exh. A.)  The only reasonable
13 interpretation of this language is that the sale of any goods,
14 regardless of whether they are provided on credit, is governed by the
15 terms and conditions.  Indeed, when the Court asked Plaintiff's counsel
16 at the May 3, 2010 hearing to identify language in the Agreement
17 supporting the idea of a credit contingency, he could not do so.[13]

18 Further, Plaintiff has produced no extrinsic evidence indicating
19 that the parties intended the Agreement (and the terms therein) to be
20 contingent upon Tricorbraun's extension of credit.  What Plaintiff has
21 produced is evidence that it obtained a Letter of Credit from a third
22 party, which it used to purchase goods from Tricorbraun.  But the mere
23 fact that Tricorbraun did not sell such goods on credit does not
24 indicate that the specific terms of the Agreement were contingent upon
25

26 [13] Plaintiff's argument that the Agreement was simply an application for credit is
   also belied by the language of the Agreement itself.  The Agreement includes
27 several terms addressing the sale of goods that are wholly unrelated to the
   provision of credit - e.g., delivery terms, warranty terms, risk of loss, testing,
   etc.  Further, it appears that Simplicity did not provide any financial information
28 in connection with this Agreement.  (Dunwiddie Decl., Exh. A, pg. 1.)

the provision of credit.  Whether or not Tricorbraun extended credit to

Plaintiff is an entirely separate matter - nothing in the Agreement

either explicitly or implicitly indicates that the provision of credit

affects the stated terms.  This conclusion is consistent with

Simplicity's understanding of the Agreement.  Jeff Wycoff testified

under oath in <u>January 2010</u> that the terms of the Agreement governed his

business relationship with Tricorbraun.  This testimony occurred many

months after Simplicity had obtained the Letter of Credit and purchased

goods from Tricorbraun.  Thus, Wycoff clearly did not believe that the

terms and conditions were dependent upon an extension of credit by

Tricorbraun.

    In sum, the argument that the November 2007 Agreement was

contingent upon an extension of credit is cut from whole cloth.

Neither the language of the Agreement nor the parties' conduct supports

that position; the Court flatly rejects it.  For the reasons stated

above, the Court concludes that the November 2007 Agreement, and the

arbitration provision contained therein, are valid and binding on

Plaintiff.

    **D.   Compelling Arbitration**

    Having concluded that the arbitration provision in the Agreement

is valid and enforceable, the question becomes where the arbitration is

to be held.  The Agreement between Plaintiff and Tricorbraun provides

that any arbitration proceedings shall take place in St. Louis,

Missouri.  (Dunwiddie Decl., Exh. A, ¶ 13.)  Additionally, at the May

3, 2010 hearing, the parties appeared to agree that if arbitration is

ordered, it should take place in St. Louis.  Section 4 of the FAA

provides, however:

1
2
3
4
5
6
7

> A party aggrieved by the alleged failure, neglect or refusal of another to arbitrate under a written agreement for arbitration may petition **any United States district court**, which, save for such agreement, would have jurisdiction under Title 28, in a civil action . . . of the subject matter of a suit arising out of a controversy between the parties, for an order directing that **such arbitration proceed in the manner provided for in such agreement**. . . . [T]he court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. **The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed.**

8  9 U.S.C. § 4 (emphasis added). Where, as here, the terms of the

9  arbitration agreement provide for arbitration in a district outside the

10 district in which the petition to compel is filed, "literal compliance

11 with parts of Section 4 is impossible." Nagrampa v. Mailcoups, Inc.,

12 No. C. 03-0208 MJJ, 2003 WL 25607105, at *7 (N.D. Cal., Apr. 9, 2003).

13 In other words, the Court cannot order arbitration in its own district

14 and at the same time order arbitration in accordance with the terms of

15 the agreement.

16     Under the plain language of section 4, the law is clear that this

17 Court cannot order an arbitration to take place outside the Central

18 District of California. Textile Unlimited, Inc. V. A. BMH and Company,

19 Inc., 240 F.3d 781, 785 (9th Cir. 2001); Snyder v. Smith, 736 F.2d 409,

20 419-20 (7th Cir. 1984), *overruled in part on other grounds by*, Felzen

21 v. Andreas, 134 F.3d 873, 877 (7th Cir. 1998); see National City Golf

22 Finance v. Higher Ground Country Club, 641 F. Supp. 2d 196, 202 n.2

23 (S.D.N.Y. 2009). The circuit courts are split, however, as to whether

24 the Court may ignore the forum selection clause in the parties'

25 arbitration agreement (despite the statute's mandate that arbitration

26 proceed in the manner provided for in the agreement) and order

27 arbitration in its own district. "The majority view holds that where

28

1   the parties agreed to arbitrate in a particular forum only a district

2   court in that forum has the authority to compel arbitration under § 4."

3   Ansari v. Qwest Commc'ns Corp., 414 F.3d 1214, 1219-1220 (10th Cir.

4   2005) (collecting cases from the Sixth, Seventh, and Third Circuits, as

5   well as from the Southern District of New York and the Colorado

6   District courts.)  The Ninth Circuit, however, appears to take a

7   different position.

8        In Textile Unlimited, Inc. v. A..BMH and Company, 240 F.3d 781

9   (9th Cir. 2001), the Ninth Circuit affirmed the district court's

10  conclusion that, despite a forum-selection clause indicating that

11  arbitration should go forward in Georgia, venue was proper in the

12  Central District of California.  Id. at 784.  In Textile, plaintiff

13  bought goods from defendant over the course of thirty-eight

14  transactions.  In each transaction, plaintiff would send a purchase

15  order and defendant would ship the goods along with an invoice and an

16  order acknowledgement.  Defendant's invoice form contained additional

17  terms on the back of the invoice, including an arbitration provision

18  calling for any disputes to be arbitrated in Atlanta, Georgia.  Id. at

19  783.  A payment dispute arose, and defendant brought an arbitration

20  action in Georgia.  Id. at 784.  Plaintiff contested the existence of a

21  valid arbitration agreement and subsequently filed a preliminary

22  injunction action in the Central District of California to enjoin the

23  Georgia arbitration.  Id. at 784, 785 n.1.  The district court in

24  California enjoined the Georgia arbitration, and the Ninth Circuit

25  affirmed.

26       The Ninth Circuit held, "[u]nder the circumstances presented by

27  this case, we conclude that the Federal Arbitration Act does not

28

1  require venue in the contractually-designated arbitration locale."  Id.
2  at 783.  The court noted that the venue provisions of the FAA "are
3  discretionary, not mandatory."  Id. at 785.  In so holding, the court
4  relied on the ruling in Cortez Byrd Chips, Inc. v. Bill Harbert
5  Construction Co., 529 U.S. 193, 195 (2000), which held that venue
6  provisions under §§ 9-11 of the FAA were permissive, not mandatory.
7  The court concluded that the Cortez analysis should apply to the FAA as
8  a whole.  Id.  Further, in analyzing the specific language of section
9  4, the Ninth Circuit concluded: "§ 4 only confines the *arbitration* to
10 the district in which the petition to compel is filed.  It does not
11 require that the petition be filed where the contract specified that
12 arbitration should occur."  Id.

13      Although Textile Unlimited is binding on this Court, the ruling
14 does not require the Court to order arbitration in the Central District
15 of California.  Rather, the language in Textile Unlimited is permissive
16 - "the [FAA] does not *require* venue in the contractually-designated
17 arbitration locale."  Id. at 783.  This language indicates that while
18 the court *may* order arbitration in its own district, it need not do so.
19 Nagrampa, 2003 WL 25607105, at *7.

20      Further, the ruling in Textile Unlimited was limited to the facts
21 of that case, see 240 F.3d at 983, which are readily distinguishable
22 from the present case.  Notably, in Textile Unlimited, the court
23 reasoned: "§ 4 . . . only embraces actions to compel arbitration.
24 Thus, injunction actions, such as the one at bar, are properly
25 considered under general venue provisions."  Id. at 785.  Thus, the
26 court specifically cabined its ruling to injunction actions.  Unlike
27 Textile Unlimited, however, the present action is a motion to compel
28

22

1    that falls squarely within § 4.

2        Additionally, in <u>Textile Unlimited</u>, the arbitration provision and

3    the accompanying forum selection clause were tucked away in an invoice

4    "so there was a strong dispute as to whether the [specific] arbitration

5    agreement had ever been affected." <u>See Nagrampa</u>, 2003 WL 25607105, at

6    *7 (summarizing the facts of <u>Textile Unlimited</u>).  The Ninth Circuit

7    distinguished that circumstance from one where, as in <u>Merrill Lynch,</u>

8    <u>Peirce, Fenner & Smith, Inc. v. Lauer</u>, 49 F.3d 323 (7th Cir. 1995), the

9    parties do not contest the arbitration provision itself and the site

10   for arbitration has been fixed.  <u>Textile Unlimited</u>, 240 F.3d at 785

11   n.1.

12       The present case fits the paradigm of <u>Merrill Lynch</u>, the case

13   found inapposite in <u>Textile Unlimited</u>.  Here, Plaintiff does not

14   dispute the existence of the arbitration provision itself, and the

15   location of the arbitration was designated as St. Louis, Missouri.

16   Further, unlike the parties in <u>Textile Unlimited</u>, here, the parties

17   appear to agree that Missouri is the proper venue if arbitration is

18   ordered; neither party has argued for arbitration in the Central

19   District of California.  These facts warrant a different result than

20   that in <u>Textile Unlimited</u>.[14]

21   _____

     [14] <u>Synder v. Smith</u>, 736 F.2d 409 (7th Cir. 1984), aptly explains why the result
22   should be different where the arbitration clause itself is not challenged and was
     freely negotiated:
23              An arbitration agreement, including its forum selection clause, is a
                freely-negotiated contract between the parties.  Courts must give effect
                to such freely-negotiated forum selection clauses . . . . [I]f Snyder were
24              to prevail here [in compelling arbitration in Illinois where the contract
                called for Texas], any party to an arbitration agreement could avoid the
25              effect of the agreed-to forum merely by filing suit in a different
                district.  This in turn could lead parties racing to different courthouses
26              to obtain what each thinks is the most convenient forum for it, in
                disregard of its contractual obligations.  This disregard is not what
                Congress intended when it enacted a statute to make arbitration agreements
27              enforceable.  Thus, the district court in this case had no power under the
                statute to order arbitration in its district in contravention of the
28              parties' agreement.

1  The Court therefore declines to compel arbitration in the Central

2  District of California.  The Court concludes that the arbitration

3  provision must be given effect, and that St. Louis is the only proper

4  venue for the arbitration.

5      **E.   Stay of These Proceedings**

6      In light of this ruling, the Court's options are limited.  "Faced

7  with the same situation, courts have either (1) dismissed the federal

8  action, . . . (2) stayed the action, . . . or (3) transferred the

9  action to the appropriate federal district court . . . ."  <u>M.C. Const.</u>

10 <u>Corp. v. Gray Co.</u>, 17 F.Supp. 2d 541, 548 (W.D. Va. 1998) (collecting

11 cases) (internal citations omitted).  Given Tricorbraun's request for a

12 stay, which is well-supported, the Court will stay the present action

13 as against Tricorbraun, so that it may file a petition to compel in St.

14 Louis, Missouri.  The action will be stayed pending the conclusion of

15 such arbitration.

16 **III. MOTION FOR A TRIAL CONTINUANCE**

17     Having concluded that the action against Tricorbraun will be

18 stayed pending arbitration, Tricorbraun's motion for a trial

19 continuance is DENIED AS MOOT.

20 **IV.   MOTION FOR SANCTIONS AGAINST PLAINTIFF'S COUNSEL**

21     Finally, Tricorbraun brings a motion for sanctions against

22 Plaintiff's counsel, Alfred Dovbish ("Dovbish"), as a result of an ex

23 parte communication between Dovbish and an employee of Tricorbraun.

24 Tricorbraun asks for sanctions in the amount of $5,000.  This motion is

25 petty and warrants little discussion.

26     Plaintiff asks for sanctions under California Rules of

27 Professional Conduct 2-100.  Rule 2-100 provides: "While representing a

28 <u>Id.</u> at 419-20.  The court finds this reasoning highly persuasive.

24

1  client, a member shall not communicate directly or indirectly about the

2  subject of the representation with a party the member knows to be

3  represented by another lawyer in the matter, unless the member has the

4  consent of the other lawyer." A "party" includes officers or directors

5  of a corporation represented by counsel. Id.

6      The relevant facts are as follows: On February 18, 2010, at

7  approximately 5:30 p.m., Andrew Bottene, a Vice President at

8  Tricorbraun, received a call on his cell phone from an unidentified

9  caller. When he answered, the caller identified himself as Alfred

10  Dovbish. According to Bottene, Dovbish said that Jeff Wycoff had told

11  him to call Bottene because Bottene was "an encyclopedia of knowledge."

12  Dovbish asked Bottene if he was aware of the lawsuit. Bottene told

13  Dovbish that he could not speak with him and that Dovbish should

14  contact Tricorbraun's corporate offices. Dovbish agreed, and ended the

15  call. The call lasted only seconds, and no substantive information

16  about the lawsuit was discussed.

17      Plaintiff had disclosed in its Rule 26 disclosures that Bottene

18  was a Vice President of Tricorbraun. Dovbish did not contact

19  Tricorbraun's counsel or ask for counsel's permission prior to

20  contacting Bottene.

21      Dovbish admits that he called Bottene, but declares that he

22  believed Bottene no longer worked at Tricorbraun. Dovbish notes that

23  the call lasted only seconds and that when Bottene informed him that he

24  was still an employee of Tricorbraun, Dovbish immediately apologized

25  and got off the phone. Dovbish's secretary (who is also his wife)

26  overheard Dovbish's end of the conversation and confirms this account

27  of the events.

28

1    Plaintiff's motion for sanctions under Rule 2-100 is DENIED.

2  First, it is not clear that Bottene was even a "party" at the time the

3  communication took place, on February 18, 2010.  Genlabs had dismissed

4  its third-party complaint against Tricorbraun on February 16, 2010, and

5  the Court had not yet granted Plaintiff's motion to amend the Complaint

6  to name Tricorbraun.  Thus, technically, Tricorbraun was not a party to

7  the lawsuit on February 18, 2010.  Regardless, however, the phone call

8  appears to be the result of Dovbish's good faith mistake about

9  Bottene's employment status – had Bottene no longer been employed by

10  Tricorbraun, Dovbish could have spoken with him.  Finally, by both

11  party's accounts, no substantive information about the lawsuit was

12  discussed during the call, and the call lasted only sanctions.

13  **V.    CONCLUSION**

14    For the reasons stated above, the Court DENIES Defendant

15  Tricorbraun's Motion to Compel Arbitration.  The Court GRANTS

16  Tricorbraun's Motion for a Stay of this Action Pending Arbitration.

17  The action as against Tricorbraun will be stayed pending the completion

18  of an arbitration in St. Louis, Missouri, in accordance with the

19  parties' Agreement.  Tricorbraun's Motion for a Trial Continuance is

20  DENIED AS MOOT.

21    Tricorbraun's Motion for Sanctions is DENIED.

22      IT IS SO ORDERED.

23

24

25  DATED:    05/06/10

26                  STEPHEN V. WILSON

27                  UNITED STATES DISTRICT JUDGE

28